**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. PIERCE DIVISION**

**CASE NO.: 2:21-cv-14390-DMM**

WENDY WOPSHALL,

     *Plaintiff*,

v.

THE TRAVELERS HOME AND MARINE
INSURANCE COMPANY,

     *Defendant.*

_____/

**PLAINTIFF'S OPPOSITION TO**
**TRAVELERS' MOTION FOR FINAL SUMMARY JUDGMENT**

     The Travelers Home and Marine Insurance Company's Motion for Final Summary Judgment [D.E. 48] should be denied because the fact question of whether Travelers acted in bad faith is reserved for the jury, and because (as this Court has previously held) Ms. Wopshall's Civil Remedy Notice satisfied the condition precedent for this suit.

**I.     WHETHER TRAVELERS ACTED IN BAD FAITH IS A QUESTION FOR THE JURY.**

     "[O]rdinarily, the question of whether an insurer failed to act in good faith is reserved for a jury so that it may examine and weigh the totality of the circumstances. *Pin-Pon Corp. v. Landmark Am. Ins. Co.*, No. 20-14013-CV-MIDDLEBROOKS/Maynard, 2021 WL 4991248 (S.D. Fla. Aug. 10, 2021) [D.E. 294] at 2 (citing *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018)). In this statutory bad faith claim against Travelers the question to be decided is whether Travelers failed to settle Ms. Wopshall's claim when it could and should have done so, had it acted fairly and honestly towards Ms. Wopshall and with due regard for her interests. *See* § 624.155(1)(b)(1), Fla. Stat. (2021); Fla. Standard Jury Inst. 404.4. The answer rests on disputed questions of material fact to be determined by a jury. *See* Harvey, 259 So. 3d at 7; *Manning v. Progressive Am. Ins. Co.*, No. 19-cv-808220 MIDDLEBROOKS (S.D. Fla. Feb. 14, 2020) [D.E. 79], [D.E. 70-1] ("Because, 'it is [ordinarily] for the jury to decide whether [an] insurer failed to act in good faith,' GEICO bears a heavy burden at this summary judgment stage."); *Berges v.*

*Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004). After *Harvey*, Judge Corrigan of the Middle District found that courts are compelled to deny an insurer's motions for summary judgment and send the case to trial. *Wiggins v. Gov't Employees Ins. Co.*, No. 3:16-CV-1142-J-32MCR, 2019 WL 338945, *1 (M.D. Fla. Jan 28, 2019).

"[T]he inherently flexible nature of the 'totality of the circumstances' standard renders a bad-faith claim unsuitable for summary disposition." *Moore v. GEICO Gen. Ins. Co.*, 633 F. App'x 924, 928 (11th Cir. 2016) (citations omitted). "Each case is determined on its own facts and ordinarily '[t]he question of failure to act in good faith with due regard for the interests of the insured is for the jury.'" *Berges*, 896 So. 2d at 680 (quoting *Boston Old Colony*) (alteration in original). "[A]n insurer's ultimate tender of the policy limits does not necessarily insulate it from liability by an insured's claim of bad faith." *King v. Gov't Emps. Ins. Co.*, No. 8:10-CV-977-T-30AEP, 2012 WL 4052271 (M.D. Fla. Sept. 13, 2012) (citing *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 15 (Fla. 3d DCA 1991).

Travelers nonetheless asks the Court to weigh the evidence and decide the fact question of whether Travelers' improper claim handling and consistent undervaluation of Ms. Wopshall's claim led to its failure to settle her claim when it could and should have. Florida law requires a jury to decide those issues. "Given the fact-dependent nature of the above considerations, bad faith actions are usually questions left to the discretion of the finder of fact." *King*, at *4; *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000) ("Good-faith or bad-faith decisions depend on the various attendant circumstances and usually are issues of fact to be determined by a fact-finder").

"In a 'first-party' action against an insurance carrier founded upon section 624.155(1)(b), which affirmatively creates a company duty to its insured to act in good faith in its dealings under the policy, liability is based upon the carrier's conduct in processing and paying a given claim." *Allstate Indem. Co. v. Ruiz*, 899 So. 2d 1121, 1129 (Fla. 2005). "The question of bad faith extends to the insurer's 'entire conduct in the handling of the claim,'" and liability turns on the fact-intensive, totality of the circumstances standard. *Batchelor v. Geico Cas. Co.*, No. 6:11-CV-1071-ORL-37G, 2014 WL 7224619, at *6 (M.D. Fla. Dec. 17, 2014) (quoting *Kafie v. Nw. Mut. Life Ins. Co.*, 834 F. Supp. 2d 1354, 1359 (S.D. Fla.2011)); *Berges*, 896 So. 2d at 680). "'[B]ad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable

cause.'" *Id.* (quoting *Jaimes v. GEICO Gen. Ins. Co.*, 534 F. App'x 860, 865–66 (11th Cir.2013)); *Powell*, 584 So. at 14.

Travelers impermissibly attempts to shift the burden of its settlement obligations to its insured, Ms. Wopshall, and her attorneys. But the focus of a bad faith case is on the actions of the insurer. *See Snowden ex rel. Estate of Snowden v. Lumbermens Mut. Cas. Co.*, 358 F. Supp. 2d 1125 (N.D. Fla. 2003) ("[C]ourts simply ask whether under all the circumstances known to the insurer would reasonable diligence and ordinary care dictate an offer to settle within the policy limits"); *Harvey*, 259 So. 3d at 12 (Fla. 2018) (citing *Berges*, 896 So. 2d at 677) ("well-established bad faith jurisprudence . . . places the focus on the actions on the insurer—not the insured."). Travelers' consistent undervaluing of Ms. Wopshall's claim and its failure to timely pay its policy limits on a claim it admits is valued at $2 Million precludes entry of summary judgment in its favor.

## II.     TRAVELERS FAILED TO SETTLE MS. WOPSHALL'S CLAIM WHEN IT COULD AND SHOULD HAVE DONE SO.

The question for the jury is whether Travelers failed to settle Ms. Wopshall's claim when, under all the circumstances, it could and should have done so. Fla. Stnd. Jury Inst. 404.4. There is ample evidence to submit to the jury that Travelers' obligation to tender the policy limits was triggered upon receipt of the June 12, 2017 demand package. Travelers undervalued Ms. Wopshall's claim initially, and continued its bad faith conduct after receipt of additional records on October 19, 2017. When Travelers received Ms. Wopshall's CRN on October 20, 2017, it had already placed 100% liability on the underinsured tortfeasor; determined that Ms. Wopshall's injuries were caused by the accident; that her injuries were permanent in nature; and that she was entitled to damages for past and future medical expenses, past and future lost wages, and past and future pain and suffering. It also knew that Ms. Wopshall's condition had continued to deteriorate and that she intended to proceed with surgery to her spine. Despite the undisputed medical records provided by Ms. Wopshall's attorneys, Travelers failed to fairly and honestly evaluate her claim, squandering the 60-day statutory safe harbor period during which it could cure its bad faith conduct. It offered $5,000 to settle her claim.

Ms. Wopshall provided Travelers with additional opportunities to settle even after the expiration of the CRN. On February 2, 2018, she provided Travelers with additional records and bills from three additional surgeries. Travelers confirmed receipt of the records to her attorneys but did not review the new records until August 28, 2018, when a supervisor first reviewed the file

and authorized a tender of the limits. Travelers instead failed to make any offer above the $5,000 previously conveyed. After another two weeks of waiting for Travelers to tender the benefits for which she had paid a premium, Ms. Wopshall filed suit on February 16, 2018. The opportunity for Travelers to settle Ms. Wopshall's claim for the policy's limits was thereafter unavailable.

    **A.  Travelers' claim handling from the date of the Accident to the date of the Final Judgment is relevant to whether it failed to fulfill its good faith duties under the totality of the circumstances.**

"In order to demonstrate good faith, '[t]he insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.'" *Kafie v. Nw. Mut. Life Ins. Co.*, 834 F. Supp. 2d 1354, 1359 (S.D. Fla. 2011) (quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla.2004) (internal quotation omitted)). "The question of bad faith extends to the insurer's **'entire conduct in the handling of the claim.'**" *Id* (emphasis added). In *Kafie*, the court considered the insurer's litigation conduct which occurred after the CRN expired, relying in part on the Florida Supreme Court's pronouncement in *Ruiz. Kafie*, 834 F. Supp. 2d at 1367–68. "As the court stated, the evidence relevant to a bad faith claim is 'whether an insurance company has processed, analyzed, *or litigated* a claim in a fair, forthright, and good faith manner.' *Id.* (quoting *Ruiz,* 899 So. 2d at 1124). *Ruiz* explicitly held that an insurer's claim file "*up to and including the date of judgment* in the original litigation" was discoverable and relevant to a first-party claim.  *Id.*

Travelers misrepresents the undisputed evidence in this case, arguing (without any factual basis) that the initial June 12, 2017 demand for the policy limits expired after 30 days. *See* [D.E. 48] at 21. The letter requested that Travelers "promptly offer the UM limits of $100,000," warning that failure to do so would result in a withdrawal of the offer and a lawsuit for the full value of Ms. Wopshall's damages. The only reference to a 30-day response was in the first paragraph of the letter which, consistent with section 627.7272, asked Travelers to "provide us within 30 days written permission to accept the defendant's BI policy limits of $100,000 and waive your subrogation rights." [D.E. 57-1] at TRAVELERS-000240. As explained by Mr. Bilotta, the demand expired "when suit was filed eight months later." Bilotta Dep. [D.E. 56] at 71:4-6. "[F]iling the CRN, sending additional records just before the CRN, then Margaret sending the additional records of the three surgeries she had with the bills and records . . . . I think its common sense that until I file a lawsuit or until I send a letter to Travelers that says, hey we're withdrawing

our prior $100,000 offer to settle the offer's out there to be accepted." Bilotta Dep. [D.E. 56] at 71:13-72:3; 75:7-76:1. At a minimum, Travelers' portrayal of the settlement window is contrary to the undisputed facts.

Travelers also ignores Florida law which holds that while the expiration of the 60-day CRN window is a condition precedent to a statutory bad faith action, it does not define the only period of time for which an insurer is liable for its bad faith conduct. The Florida Supreme Court confirmed that while "'determination of the existence of liability on the part of the uninsured tortfeasor and the extent of the [insured's] damages' are elements of a cause of action for bad faith. Once those elements exist, there is no impediment as a matter of law to a recovery of damages for violation of section 624.155(1)(b)1 dating from the date of a proven violation." *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000) (quoting *Blanchard*, 575 So.2d 1289 (Fla.1991). "The sixty-day window is designed to be a cure period that will encourage payment of the underlying claim, and avoid unnecessary bad faith litigation." *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1282 (Fla. 2000) (citation and internal quotation marks omitted). This cure period "provides insurers with a final opportunity 'to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate the contractual benefits are owed.'" *Fridman*, 185 So. 3d at 1220 (quoting *Talat Enters.*, 753 So. 2d at 1284). "[I]f an insurer fails to respond to a civil remedy notice within the sixty-day window, there is a presumption of bad faith sufficient to shift the burden to the insurer to show why it did not respond." *Id.* (citation and internal quotation marks omitted).

The Florida Supreme Court's repeated pronouncements, including its recent opinion in *Harvey*, all categorically reject Travelers' attempt to limit the consideration of claims handling evidence to a certain time period, as an insurer's good faith duties continue throughout the claim until the entry of final judgment. Travelers concedes that it had an obligation to "continue to evaluate the claim and try to resolve it" even after the CRN expired, and an ongoing duty to pay what is owed. Bryers Dep. [D.E. 50] at 165:24-166:6; 166:13-22. But Travelers persists (as it has throughout this case) in making arguments unsupported by fact or law.

### B. Travelers Relied Solely on an Overworked and Improperly Trained and Supervised Adjuster to Handle Ms. Wopshall's Claim.

Travelers delegated the entirety of the evaluation of Ms. Wopshall's UM Claim to adjuster Michelle Waring without any supervision or support, despite its knowledge of her deficient claims handling. "[T]here was no managerial oversight. Michele's a - - Ms. Waring's a very seasoned

adjuster, and she was capable of reviewing this demand." Bryers Dep. [D.E. 50] at 59:6-16.  But this blind reliance on a "seasoned adjuster" led Travelers to undervalue Ms. Wopshall's claim and reject numerous opportunities to settle for her policy limits before suit was filed on February 16, 2018.

By then end of 2016, Travelers had reviewed Ms. Waring's handling of claims over the previous 12 months and had graded her performance at 68.2% because "As new information is received throughout the life of the claim, the evaluation of damages and/or causation should be adjusted to reflect the new information. This should be an area of focus." Waring Personnel File, attached as Ex. A, at PERSONNEL-000107-108.  Ms. Waring complained to her supervisors that her caseload was too high, preventing her from properly handling claims. *See* PERSONNEL-000092-93 ("The increase in claim volume resulted in some gaps in your claim handling.  One opportunity was as new information was received there were some delays in updating the BIW, Reserves and your resolution strategy"); PERSONNEL-000103 ("Employee Comments: We have had a high volume with a variety of changes and miscommunications that have affected the overall grading of our claims.  I do the best that I can with the information that I have at the time and with the claim volume.").

The concerns regarding the timeliness and accuracy of Ms. Waring's claim handling did not resolve following her below average reviews in 2016. By the middle of 2017 (the time period in which Ms. Waring was handling Ms. Wopshall's claim), Ms. Waring's reviews continued to note that the "main areas of opportunity stem back to timeliness." Ex. A at PERSONNEL-000124. "When you receive new information on litigated and non-litigated claims, the BIW, reserves and file notes should be updated." *Id.* at PERSONNEL-000125. "You should double check data integrity accuracy on for[sic] the medical injury screen and contact dates." *Id.* And despite noting that "[o]ver the past few months new receipts have leveled out and your pending has decreased to a more management level," Ms. Waring still struggled to "complete work timely." *Id.* at PERSONNEL-0000124-125. By the end of 2017, Ms. Waring was still receiving a below average score of 89.9%, noting that "As new information is received, your file notes should have rationale to support an updated resolution strategy. This may include updating your BIW, subsequent reserves and utilizing other resources to evaluate the claim. This should be completed in 30 day or less based on the unique needs of the file." *Id.* at PERSONNEL-000146.

Rather than supervise Ms. Waring, Travelers relied on the UM Worksheets she completed, did not review any of the source medical documents received on Ms. Wopshall's claim, and provided little to no oversight, explaining that she was a "seasoned" adjuster. *See* Bryers Dep. [D.E. 50] at 41:22-42:11; 58:14-20; 59:6-16. This lack of oversight and blind trust is no surprise given the negative reviews that Ms. Bryers received regarding her managerial duties.

In her 2015 mid-year review, Ms. Bryers' supervisor noted that "[a]ccurate completion of the medical injury screen continues to be a challenge." Bryers Personnel File, attached as Ex. B at BRYERS-000262. By the end of that year, Ms. Bryers' manager advised her that she "should not give the claim representative the benefit of the doubt when the documentation does not support it," encouraging her to be more objective in her management and supervision. Ex. B at BRYERS-000240. The same review still found that accuracy of the medical injury screen, subsequent reserving, and proper evaluation tools were all areas that needed improvement, as "[r]eserves should be updated timely when new information is received." *Id.* at BRYERS-000249. In 2016 Ms. Bryers' was still not adequately supervising her team. During her mid-year review, it was observed that "at times the team members do not respond to [Ms. Bryers'] direction in a timely manner." *Id.* at BRYERS-000290. Ms. Bryers end-of-year review revealed that she was "slow to recognize a potential performance issue on [her] team." *Id.* at BRYERS-000267. Her team's technical and strategy foundation results were below average for the company.

> Resolution outcome questions reveal a need for a more proactive approach updating the evaluation timely based on new information and a more proactive follow up in attempts to resolve the claim once an offer has been made. Your units performance significantly lags your peer groups at 67.5% adequacy.

*Id.* at BRYERS-000271. Ms. Bryers herself recognized that "timeliness was an area that really declined in 2016. The main area of opportunity has been when new information is received that the file strategy, BIW and reserves are updated timely." *Id.* at BRYERS-000278. These concerns were echoed by her manager who wrote that her unit's results were below average and was "greatly influence by the need to use and update the evaluation tools results during the life of the claim." *Id.* at BRYERS-000282.

In 2017, while Ms. Wopshall's UM claim was being handled by Ms. Waring, her supervisor, Ms. Bryers, was managing a "pending of over 1600 FL injury claims which is approximately 56% workload above the model. This in itself was a challenge to provide technical support and ensure that all claims were handled appropriately…" *Id.* at BRYERS-000304. The

claims under Ms. Bryers supervision reflected "inconsistent accuracy of medical injury screen[s]." *Id.* at BRYERS-000312. The overall results for her team were on the "lower range of acceptable." *Id.* at BRYERS-000314. And during her 2017 mid-year review, completed only days before Ms. Wopshall's initial demand was received, Ms. Bryers was told that she needed "to manage performance issues more aggressively." *Id.* at BRYERS-000321.

### C. Travelers' Overworked Employees Undervalued Ms. Wopshall's Claim.

By the time Ms. Wopshall's UM Claim was opened, Travelers was aware of Ms. Waring's history of failing to update important injury information on a timely basis. This consistent failure is evidenced in the documentation of Ms. Wopshall's claim file and claim notes, where the additional records of Ms. Wopshall's surgeries were received on February 2, 2018 but not reviewed and the claim reevaluated until August 2, 2018, six months after suit was filed. This documented failure is fatal to Travelers' defense in this action. And despite numerous reviews in which Ms. Bryers was told she needed to more closely and aggressively supervise her adjusters, she provided "little oversight" to Ms. Waring during the handling of Ms. Wopshall's claim. On June 12, 2017, Ms. Wopshall provided Travelers with her initial demand package which stated:

> This incident severely affected Wendy who continues to experience pain daily. You should promptly offer your UM limits of $100,000 as full and final settlement of all claims arising out of this incident. If the matter is not resolved promptly and to the satisfaction of everyone concerned, this settlement request will be withdrawn and suit will be initiated for the full value of the injuries and damages sustained.

[D.E. 57-1] at TRAVELERS-00242. It took Travelers three weeks after receipt to evaluate the records, completing the first UM worksheet on July 7, 2017. Once completed, it was clear that Travelers was not fairly and honestly evaluating the claim, placing an almost singular focus on reducing the amount it was willing to pay for Ms. Wopshall's economic damages.[1]

Ms. Waring relied solely on the lien from Ms. Wopshall's health insurer, Aetna, to determine the past medical expenses. A review of Ms. Wopshall's actual medical bills confirm that the lien alone did not accurately represent what Ms. Wopshall was owed for her out of pocket expenses already paid, as well as the additional amounts that her medical providers were billing

---

[1] Despite receiving below average reviews in nearly every area of her job performance, Ms. Waring received positive reviews for her ability to save Travelers money by reducing the amount of medical damages Travelers was willing to pay its insureds. *See* Ex. A at PERSONNEL-000092 ("[Y]ou have become very proficient at investigating medical bill reductions.").

her for directly. The Patient Ledger from Aetna itself confirms that Dr. Yono was treating Ms. Wopshall under a letter of protection and was thus billing her for the full balance of services. *See* [D.E. 57-1] at TRAVELERS-000783-86. There were additional balances that were listed as "patient" responsibility for services rendered by Dr. Rabih Kashouty on the lien notice itself. *Id.* at TRAVELERS-000786. As the records from Dr. Poto demonstrate, Ms. Wopshall had a deductible of $1,500, and he intended to balance bill for unpaid balance of her medical treatment. *See* Poto Records *Id.* at TRAVELERS-000382 (PATIENT NOTES dated 05/04/2017 "this patient is represented by an attorney and should be balance billed or collect pre-payment for visits/AE"); *see also* Bryers Dep. [D.E. 50] at 67:25-68:2. The medical bills from South FL Orthopedics & Sports Medicine dated June 9, 2017, show that after adjustments from the Aetna payments, Ms. Wopshall still owed a balance of $1,206.47. [D.E. 57-1] at TRAVELERS-000456-58. And the St. Lucie Medical Center Records from Ms. Wopshall's January 2017 elbow surgery show that she made a payment directly of $200.00 from her mastercard, and another $100 payment for a facet injection on September 19, 2016. *Id.* at TRAVELERS-000537-540; TRAVELERS-000642. Treasure Coast SC also billed Ms. Wopshall for an additional $509.00 for her left cubital decompression surgery, after applying a contractual write-off and insurance payment. *Id.* at TRAVELERS-00697.

Travelers' undervaluation of Ms. Wopshall's claim was not limited to its evaluation of her past medical bills. Travelers only allotted Ms. Wopshall's past lost wage claim at the amount of her short-term disability lien. But Ms. Wopshall was still not able to return to work at the time her initial demand was sent to Travelers. And Travelers knew that even the limited amount covered by Ms. Wopshall's disability insurer only constituted 60% of her lost wages because Ms. Wopshall's attorneys had already provided Travelers with that information over a year earlier. *See* Claim Notes at TRAVELERS-008752 Note on 2/19/2016 12:01:36PM; Bryers Feb. Dep. [D.E. 50] at 68:22-69:1 (agreeing that the adjuster should request information with specificity); Doucette Dep. [D.E. 68-2] at 101:16-19. Despite acknowledging that disability policies typically do not cover 100% of lost wages never inquired further or sent any written request for information regarding Ms. Wopshall's wage claim. Nor did Travelers place any value on future lost wages.

Travelers also placed a <u>zero</u> value for any future medical treatment. Ms. Wopshall's medical records (which were quoted in the body of the cover letter) stated that she was "**<u>expected</u>** . . . [to] need future radiofrequency ablations of her bilateral SI joints and/or a bilateral SI joint

fusion, which may cost 5,000$ to 50,000$." [D.E. 57-1] at TRAVELERS-241; 000334 (emphasis added). Travelers noted that she had already exceeded the typical amount of visits for pain management, physical therapy, and other conservative treatments, indicating that Ms. Wopshall's injuries were serious, permanent, and required additional medical treatment to improve or resolve. July 7, 2017 UM Worksheet [D.E. 34-4] at TRAVELERS-008405 ("Reviewed calendar and there were 69 Tx's prior to ERD and 1tx after ERD); Bryers Dep. [D.E. 50] at 63:1-11. And in her 2019 mid-year review, Ms. Waring's supervisor included an instruction that "alleged future medicals should capture the amount of future medical alleged by the claimant or plaintiff attorney." Ex. A at PERSONNEL-000171.  But Ms. Waring again failed to do so.

At the time it was adjusting the claim, Travelers had no basis for omitting future treatment: Travelers did not note any disagreement with Dr. Poto's assessment, nor did it request an independent medical examination or any additional medical information regarding her need for future treatment. *See King v. Gov't Emps. Ins. Co.*, No. 8:10-cv-977-T-30AEP, 2012 WL 4052271, *4 (M.D. Fla. Sept. 13, 2012) (denying summary judgment where the insurer "failed to conduct any investigation into the extent of [the insured's] injuries."). The only additional records requested were to eliminate any questions regarding causation of Ms. Wopshall's injuries – not the severity of them.

In *Batchelor v. GEICO Cas. Co.*, the insurer did not allocate any value towards future medical treatment, asserting that there was no indication that the insured was a surgical candidate. The court rejected this argument on summary judgment, finding that there was evidence to support that "(1)the Accident was *not* low impact with minimal damage to the vehicles involved; (2) Plaintiff's complaints of radiculopathy did *not* conflict with the diagnostic studies; (3) Dr. Weiss' treatment recommendations were *not* limited to conservative care; (4) the medical records provided to Geico demonstrated that Plaintiff suffered a permanent injury; and (5)  Geico was *not* presented with significant issues concerning causation." *Batchelor*, 2014 WL 7224619 at *7.

Citing to the records provided in Ms. Wopshall's initial demand package, Susan Kaufman – a 25 year claims adjuster who worked for Travelers for 20 years – summarized that:

> Dr. Antonio Poto MDO, is an interventional pain management specialist who noted that he mainly treated Ms. Wopshall for her lower back pain, with Dr. Yono addressing her neck. Dr. Poto started treating Ms. Wopshall on 3/8/16, and his treatment included **multiple bilateral SI joint injections, 2 RFA's of bilateral SI joints, along with medication management for her lower back due to pain radiating down into bilateral buttocks and down her left leg.** The doctor noted

> that the treatments were only **mildly effective** in alleviating the pain in her lower back. (Wopshall 243) Dr. Poto noted in his final report that the areas he treated may well be **predisposed for future problems** and he expects Ms. Wopshall to **need future RFA's and/or SI joint fusion**, which may cost $5000-$50,000. He rated her a 6% due to her lumbar spine injury. There was no indication Ms. Wopshall returned to her pre-loss condition.

Kaufman Report [D.E. 46-1] at 16 (emphasis in original); *see also* Demand [D.E. 57-1] at TRAVELERS 000242. She also noted that it appeared that Dr. Poto's estimate at "the low end of the range was an error as Travelers knew the 1st RFA that was done had cost approximately $17,000 and the 2nd RFA had cost $34,000." Kaufman Report [D.E. 46-1] at 22. Travelers' explanation for omitting any value to future treatment was that since Ms. Wopshall had reached maximum medical improvement, there would not be any consideration of future medical expenses. As explained by Ms. Kaufman, this does not comport with the industry customs and standards of good faith claims handling.

- The term "maximum medical improvement" does not mean a person will not require any future medical treatment. What it does mean is that any symptoms or functional issues related to the injury that are still present at that point are going to remain with the person on a permanent basis. Commonly, a person who has reached maximum medical improvement and who is deemed to have a permanent impairment will require follow up medical treatment for the condition, often for the remainder of their life. In fact, such conditions often worsen with time, and the person can end up requiring very extensive and costly future treatment. Ms. Wopshall would clearly be entitled to be compensated for any such future care she might require, and Travelers wholly neglected to assign any value at all to this important component of damages.

- Ms. Wopshall's Pain Management provider documented her need for future RFA's or SI fusion at a cost of up to $50,000. Travelers' file failed to document any medical evidence to the contrary or to provide any sort of rationale for not including these future expenses in their evaluation of damages. Given the absence of any information to the contrary with respect to the fact this lady had been deemed to have a permanent impairment and given that she had provided the company with documentation outlining certain expensive future treatment that would be required, it is inexplicable as to how Travelers could have felt justified in assigning no value to the future medical expenses.

Kaufman Report [D.E. 46-1] at 24. Travelers' evaluation of Ms. Wopshall's non-economic damages was also inadequate. *See* Kaufman Report [D.E. 46-1] at 21 (opining that $3500 for past and future pain and suffering for the cervical spine injury "would be more appropriate in a low speed parking lot loss with no objective findings on MRI), 22 (opining that only $10,000 for past and future pain and suffering for her elbow injury and surgery was "unreasonable and clearly

inconsistent with industry standards"); 23 (opining that the allotment for past pain and suffering of her lumbar injury was "unreasonably low, and it was nowhere near the standard range of values typically assigned within the industry when evaluating such injuries and treatment.").

On July 11, 2017, Travelers responded that it would not be making any offers[2] and sent its first and only request for medical information, asking for three years of prior medical records, as well as any records related to incidents reported in the Insurance Services Office report it received. In response, Ms. Wopshall's attorneys provided Travelers with all the requested information.[3]  On September 1, 2017, Travelers concluded that Ms. Wopshall's injuries were related to the accident, and not to any prior incidents. *See* Claim Notes [D.E. 57-2] at 008795.

On October 19, 2017, Ms. Wopshall's attorneys provided additional medical records and bills. The records demonstrated that Ms. Wopshall's condition continued to deteriorate, that she was unable to walk without assistance of a walker or wheelchair, needed her spouse to help with daily activities, had been hospitalized for three days due to debilitating pain, and had advised her

---

[2] Like the insurer's self-serving explanation of its undervaluation in *Batchelor*, Travelers fails to support its omission of any valuation for future medical expenses. Travelers' response to the initial demand alone should preclude entry of final judgment, as the records triggered its duty to pay Ms. Wopshall the full policy limits.  Ms. Kaufman opined that:
> Based on all my training and decades of experience in the evaluation of bodily injury claims, I feel it is quite clear that Travelers should have evaluated Ms. Wopshall's injury claim as having a value of $210,000.00 or more once they received the records contained in the 6/12/17 correspondence, at which point they were first provided the opportunity to fairly evaluate and resolve the claim.  Kaufman Report.

[D.E. 46-1] at 26.

[3] On August 10, 2017 Ms. Schobel asked if she could send records to Ms. Waring via e-mail. *See* [D.E. 57-4] Travelers Prod 10/3/2017 e-mails 0019. Ms. Waring did not respond, nor did she note this communication in her claim notes. On August 14, 2017 Ms. Waring noted that she received a call from Margaret and "[s]he is going to send my prior records from the PCP." Claim Notes [D.E. 57-2] at TRAVELERS-0008785 Note at 8/14/2017 8:58:03AM. The note did not mention Ms. Schobel's request to send the records via e-mail four days earlier. It was not until after the logged incoming follow-up call from Ms. Schobel that Ms. Waring responded. *See* [D.E. 57-4] Travelers Prod 10/3/2017 e-mails 0018. And despite those records being received by Travelers on August 15, 2017, Ms. Waring did not log receipt of them at that time. Ms. Schobel followed up again on August 21 and 28, 2017 to confirm receipt of the records and provide additional information, Ex. A at Wopshall 000809-810. On September 1, 2017, Ms. Waring first logged receipt of the records and e-mail, copying and pasting the text but omitting the date that the information was received. *See* Claim Notes [D.E. 57-2] at TRAVELERS-008785 Note at 9/1/2017 at 3:09:04PM, *compare* August 21, 2017 e-mail from M. Schobel to M. Waring, [D.E. 57-5] at Travelers Prod 10/3/2017 e-mails 0146-0147.

doctors that she intended to proceed with a fusion surgery but was pending approval from her insurer. [D.E. 57-6] at Travelers Prod 10/3/2017 e-mails 0261, 0273, 0295-0299. The following day, Ms. Wopshall's attorneys filed a Civil Remedy Notice on her behalf.  Travelers admits that by October 2017 when the CRN was filed, Ms. Wopshall's condition had deteriorated. Bryers Dep. [D.E. 50] at 143:15-24; Doucettte Dep. [D.E. 68-2] at 141:9-17.

Ms. Waring failed to note receipt of the October 19, 2017 records until two weeks later, on November 3, 2017, copying and pasting the text of the email but omitting the date it was actually sent.  This was particularly deceptive, as Ms. Waring logged a note on October 20, 2017 that she "Rec'd a VM from Margaret advising she is in the process of forwarding updated records/lien amounts." Claim Notes [D.E. 57-2] at TRAVELERS-0008786 Note at 10/20/2017 at 12:43:46PM. The "updated records/lien amounts" were sent the day prior, and Ms. Waring confirmed their receipt on October 20, 2017, less than one minute after logging the note. *See* [D.E.70-2] at Travelers Prod 10/3/2017 e-mails 0383. Travelers' deficient claims handling did not end with its delayed and deceptive logging of the records. The UM worksheet completed on November 3, 2017 based on these records continued to undervalue Ms. Wopshall's claim.

Despite having records of additional pain management injections, a 3-day hospital stay due to intractable pain, as well as a referral for home health care because Ms. Wopshall was essentially wheelchair bound and unable to conduct activities of daily life without assistance, Travelers only increased her past medical expenses by $170.90. Nov. 3, 2017 UM Worksheet [D.E. 48-7] at TRAVELERS-008412, *compare* July 7, 2017 UM Worksheet [D.E. 48-3] at TRAVELERS-008405.  It also increased her past lost wages to reflect a new lien issued by her long-term disability insurer. Nov. 3, 2017 UM Worksheet [D.E. 48-7] at TRAVELERS-008413. No allotment was made for the lost wages that disability did not cover, nor was any amount included for future lost wages despite her inability to return to work. *Id.*; *see also* Bryers Dep. [D.E. 50] at 79:13-18 ("she had a lot of medical treatment, and you would expect that she was going to get better, so we didn't really know when she would be getting back to work."); Demand Letter [D.E. 57-1] at TRAVELERS-000700 ("Patient has been out of work since onset of injury"); TRAVELERS-0008019 ("Patient worked full-time as Pharmacy Tech and Med Lab Tech.  Patient has been on leave since the accident."); TRAVELERS-000587 ("she cannot drive, work  or walk due to the pain."); TRAVELERS- 000347-48 ("with turning her neck she is sometimes faced with pain that can drop her to her knees . . . [she] is wondering how she is going to be able to perform due to this

pain, and she is wondering if there is anything I can give her to help her with her pain so she is able to perform for physical therapy. . . . Patient is not progressing towards his/her functional goals."); TRAVELERS-000351 ("lower back pain is constant and greater than 3/10 . . . impeding her ability to **work**, walk and stand.  She states that her neck pain and radiating left arm pain is greater than 7/10 . . . impeding her ability to use that left arm at all."); (emphasis added); TRAVELERS-000360 ("hardship to return to the office every 72 hours"); TRAVELERS-000372 ("Patient has intermittent or continuous pain causing functional disability"); TRAVELERS-000401(January 10, 2017 SOAP Note "Patient is currently not working and has all restrictions in place.  Patient's pain is related to an injury which occurred on 2/3/16").

Travelers increased the "Past and Future Pain & Suffering" allocation for Ms. Wopshall's lumbar spine by $10,000, noting that she "[c]ontinue[s] having pain.  She is having PT at her home and may seek surgery. Therefore increasing." Nov. 3, 2017 UM Worksheet [D.E. 48-7] at TRAVELERS-008413. Under future medical expenses, Travelers noted that Ms. Wopshall "continues to treat.  She is having PT at her home which is being billed to her health carrier.  Allowing 9,361 until we can evaluate further." *Id.* Based on these calculations, Travelers determined Ms. Wopshall's "Full Injury Value" to be worth $10,000. *Id.* at TRAVELERS-008414. Remarkably, Travelers did not assess any value for a future spinal surgery – even while noting that she "may seek surgery." Included in the October 19, 2017 records was a report from Neurosurgeon, Dr. Szentirmai dated July 21, 2017, where he opined that if conservative treatment failed, she would need surgery. *See* [D.E. 57-6] at Travelers Prod 10/3/2017 e-mails 0364. The records of Ms. Wopshall's treatment and her medical condition over the next three months confirm that conservative treatment had failed. *See generally* [D.E. 57-4] at CARECENTRIX Records, Travelers Prod 10/3/2017 e-mails 0468. And during her October hospitalization, the physicians at Martin Medical Center also opined that she "[h]as seemingly failed all conservative outpatient management". *See* Attestation Signed by Sean Miller, MD at 10/03/17 1817, [D.E. 57-6] at Travelers Prod 10/3/2017 e-mails 0320.  Describing Ms. Wopshall' recent attempt at pain relief under the care of Dr. Yono which "failed to take." Travelers Prod 10/3/2017 e-mails 0322.  The hospital records also reflected that Ms. Wopshall was awaiting insurance approval but intended to go forward with a spinal fusion surgery once approved. [D.E. 57-6] at Travelers Prod 10/3/2017 e-mails 0297.

Based on this new valuation, on November 3, 2017, Travelers offered Ms. Wopshall $5,000 to settle her UM claim. [D.E. 57-7]. This was half the value it had internally placed on her claim and multiples less than the policy limits Ms. Wopshall had demanded. Following receipt of the $5,000 offer, Ms. Wopshall's attorney Jeffrey Friedman discussed the claim with Ms. Waring and told her "something to the affect that I was really surprised that's all she was offering based on the demand . . . the contents of the demand letter." Friedman Dep. [D.E. 51] at 30:6-15; *see also* Bilotta Dep. [D.E. 56] at 118:5-18.

Other than offer Ms. Wopshall $95,000 less than was warranted based on the medical records in its possession, Travelers took no other actions to investigate or cure its bad faith violations during the 60-day statutory cure period which expired on December 19, 2017. No roundtable discussion was conducted, even though one was automatically scheduled upon receipt of the CRN. *See* Claim Notes [D.E. 57-2] at TRAVELERS-008786 Note on 10/30/2017 2:36:49PM; Bryers Dep. [D.E. 50] at 109:12-20. Travelers did not send any written requests for information, did not request a compulsory medical examination, or exercise any other investigatory options under the "power of the policy." On November 9, 2017, only six days after belatedly evaluating Ms. Wopshall's October medical records, Ms. Waring drafted a formal response to the CRN. [D.E. 8-1]. On December 4, 2017, Travelers also responded to the CRN through the Department of Financial Services ("DFS") online form. [D.E. 5-1].

The day of Travelers' CRN response (December 4, 2017), Ms. Wopshall was hospitalized again. The following day, Dr. Paul performed three surgeries: an additional ulnar surgery to her elbow, a cervical laminectomy, and a lumbar laminectomy. Ms. Wopshall remained hospitalized for ten days until she was discharged on December 14, 2017. The surgeries, while less invasive than a fusion, were to the same area of her spine which was recommended for surgery in the records provided to Travelers on June 12 and October 19, 2017.

On February 2, 2018, Ms. Wopshall's attorneys provided records of the three additional surgeries, and a $94,265 bill dated January 24, 2018. [D.E. 57-8]. Three days later, Ms. Waring responded, "Received. Thanks" [D.E. 57-9] but did not log receipt in her claim notes. In the meantime, Ms. Waring peppered her claim file with misleading notes. On February 5, 2018, six minutes after acknowledging receipt of the surgical records, Ms. Waring logged a note that she "Spoke to Margaret and confirmed that she is sending me updated records, and she has requested an updated Aetna lien." Claim Notes [D.E. 57-2] at TRAVELERS-008788 Note at 2/5/2018

9:09:15AM. But that information was already sent three days earlier and seen by Ms. Waring. On March 7, 2018 Ms. Waring still had not logged receipt of the surgical records but wrote a note that "PA is in the process of sending updated records." *Id.* at 3/7/2018 7:51:56 AM.  In fact, there is no acknowledgment of receipt of the records anywhere in the claim notes. Instead, over six months later Ms. Waring noted that she was reviewing records received via subpoena in the underlying action and that "Plaintiff had another elbow surgery, and a cervical & lumbar laminectomy." *Id.* at TRAVELERS-008792 Note at 8/27/2018 10:18:31AM. This information was initially received on February 2, 2018, not via subpoena on August 27, 2018.

Among the excuses advanced by Travelers' adjuster and her supervisors for the nearly seven-month delay in evaluating Ms. Wopshall's injuries was that Ms. Waring was waiting for the liens related to the surgeries before she would update her valuation. But Travelers' internal guidelines require that adjusters update their valuations based on actionable information, not perfect information. *See* the Knowledge Guide, Ex. C at GUIDELINES-000230; Bryers Dep. [D.E. 50] at 19:17-21, 148:9-18.  And Ms. Bryers' 2019 mid-year review of Ms. Waring's performance advised that "[e]ven if the medical bills do not show contractual adjustments . . . consideration should be given to reduce the bills and use reasonably and necessary mitigators in negotiations." Ex. A at PERSONNEL-000171.

Travelers attorneys attempt to re-write history, arguing that if Travelers had only known of Ms. Wopshall's December 4-December 14, 2017 hospitalization and surgeries, it would have tendered the policy limits by the end of the CRN cure period, which expired only days after Ms. Wopshall's discharge on December 14, 2017. But this argument is belied by Travelers' claim file and the testimony of its adjuster and corporate representative. Again, the argument is not supported by the facts or the law.

It is undisputed that Travelers had records of Ms. Wopshall's surgeries and hospitalization, as well as the January 24, 2018 bill as of February 2, 2018. Ms. Waring did not alert her supervisor to the records, did not request an increase from her $40,000 settlement authority to tender the policy limits, did not make any new settlement offers, and did not re-evaluate the value of Ms. Wopshall's claim. *See* e-mail from M. Waring to M. Schobel, D.E. 57-8; *see also* Bryers Dep. [D.E. 50] at 149:11-18; Waring Dep. [D.E. 53] at 127:4-11.

At the time it was handling the claim – and for over 6 months after receipt of the records – Travelers continued to dispute that Ms. Wopshall's claim was worth the policy limits. It relied

16

solely on the unsupervised claim handling of Ms. Waring until August 28, 2018, when her supervisor Ms. Bryers finally reviewed the file and noted the total amount of boardable medicals and the surgeries as sufficient information to tender the policy limits. And while Travelers' statement of facts disingenuously argues that it could not evaluate Ms. Wopshall's claim or tender the policy limits until it received an update Aetna lien reducing the surgery bill, Travelers first evaluation of the medical records and bill and decision to tender was made without receipt of the updated Aetna lien[4].

Travelers' expert Daniel Doucette agreed that upon receipt of the medical records of Ms. Wopshall's December 5, 2017 surgeries, he "would have looked at tendering." Doucette Dep. [D.E. 68-1] at 163:5-7. But Travelers' corporate representative, while conceding that Travelers had an ongoing duty to tender its limits, continued to make excuses for why its adjuster could not evaluate the February 2, 2017 records, testifying that "the adjuster hadn't had time to – here the adjuster didn't review th[e records], or have time to review them, it takes time to review and then update the case." Bryers Dep. [D.E. 50] at 166:23-167:19. When asked how long it took the adjuster to update her UM worksheet two months later on April 4, 2018 to reflect an updated lien notice, Travelers advised that it took an hour. *Id.* at 167:20-22. But even at this two-month juncture, Travelers still had not included any of Ms. Wopshall's December surgeries in its valuation. *Id.* at 167:23-168:10.

Travelers was apparently more focused on defending itself in bad faith claims than properly training and supervising its employees, changing its claims manuals as of January 2016:

Removed language per request of Claim Legal:

"There is a saying in the insurance industry: if it's not in the claim file, it didn't happen. The idea behind this saying – often used by attorneys for injured parties who have brought a legal claim against an insurer – is simple: most carriers have strict requirements that all actions be documented in the claim file. If you have taken some action but did not document it in the claim file, a jury may presume that the action never truly occurred. Thus, it is critically important to input your file notes in a proper and timely manner."

---

[4] The UM worksheets that were completed following its August decision to tender continued to include the full amount of the bill, with a note that it could potentially be reduced. *See e.g.* Aug. 27, 2018 UM Worksheet at TRAVELERS-008544 ("St Lucie Medical $96,795) (12/05/2017) Pending MBR"). The potential reduction, however, did not change the undisputed fact that Ms. Wopshall's claim was worth in excess of the $100,000 policy limits without any accounting for or reduction in her economic damages.

Ex. C, GUIDELINES-000001. While highlighting the reality that claim notes are often used as evidence in bad faith cases, Travelers' intentional deletion of this provision demonstrates that it was more concerned with the notes being used against the company in a bad faith case than it is with training its adjusters to keep accurate and complete records. Ms. Wopshall's claim is an example of where Travelers failed on an institutional level and the results of that failure.

### D. Travelers Impermissibly Asks this Court to Make Credibility Determinations on Summary Judgment.

In *Kafie*, the court denied summary judgment, holding that there were disputed issues of fact related to the insurer's claim handling and denial of benefits. The insurer there, as Travelers does here, argued that the insured's complaints of injury were subjective and "noted that his doctors' reports were based on what he imparted to them." *Kafie*, 834 F. Supp. 2d at 1361. The court noted that "Northwestern appears to have largely denied Kafie's claim based on inconsistencies between his observed conduct and his statements to Kern during his interview." The insured disputed the insurer's expert witness testimony, and its internal reports as being biased and not credible. In light of the disputed issues of fact, the court held that summary judgment was not appropriate. *Id.*

The issue of whether Travelers fairly and honestly evaluated Ms. Wopshall's claim is reserved for the jury. Travelers claim notes contain numerous entries that are provably false. Its adjuster's valuation of Ms. Wopshall's claim omits key elements of damages, reduces her economic damages without any investigation or acknowledgment of costs which Travelers concedes Ms. Wopshall was entitled to at the time, and misrepresents the nature and extent of Ms. Wopshall's injuries. Travelers attempts to justify its actions by arguing that Ms. Wopshall's voluminous medical records are only "self-reports," while ignoring records from over a hundred visits to her pain management doctors, records from her home health care aides and physical therapists, records from her neurologist regarding the consequences of conservative treatment failing, and records from her hospitalization for intractable pain, urinary difficulties, and immobility due to her injuries from the accident.

### III. MS. WOPSHALL'S CRN WAS SUFFICIENT AND TRAVELERS DID NOT "CURE" ITS VIOLATIONS BECAUSE IT FAILED TO TENDER ITS $100,000 POLICY LIMITS WITHIN THE 60-DAY STATUTORY PERIOD.

The issue of the sufficiency of Ms. Wopshall's CRN has been litigated and re-litigated throughout the life of this case. To avoid repeating the same arguments already before this Court,

Ms. Wopshall incorporates and adopts by reference her briefing in her Motion for Partial Summary Judgment [D.E. 58] and Reply in Further Support of her Motion for Partial Summary Judgment [D.E. 71]. Ms. Wopshall also notes that this Court already considered and rejected the identical arguments set forth in Travelers' Motion for Final Summary Judgment, finding that Ms. Wopshall's CRN complied with Fla. Stat. § 624.155. *See* [D.E. 59]. Travelers provides no legal or factual basis for the Court to depart from its prior holding.

Having lost (multiple times) on its sufficiency arguments, Travelers' attorneys set forth a new defense, arguing that it "cured" its violation by offering Ms. Wopshall $5,000 to settle her claim. "To cure an alleged violation and to avoid a civil action, an insurer must pay the claim . . . before the sixty days expire. *Talat Enterprises, Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1282 (Fla. 2000). "It naturally follows that for there to be a 'cure,' what had to be 'cured' is the non-payment of the contractual amount due the insured. In the context of a first-party insurance claim, **the contractual amount due the insured is the amount owed pursuant to the express terms and conditions of the policy** after all of the conditions precedent of the insurance policy in respect to payment are fulfilled." *Id.* at 1283 (emphasis added).

*In Batchelor v. Geico Cas. Co.*, 2014 WL 7224619, the insured filed two CRNs. The first complained that the insurer "had made no offer to settle the Claim despite Plaintiff's 'reasonable settle offer for payment of policy limits.'" 2014 WL 7224619 at *4. Following the expiration of the CRN, the insured provided new information to the insurer which changed her entitlement to damages. She then filed a second CRN which similarly complained that the insurer responded to that the insurer responded to her "reasonable settlement offer" with an offer of "only $2,500.00." *Id.* In evaluating whether the insurer was entitled to summary judgment, the court noted that "[t]his 60 day 'window' provides insurers with a final opportunity 'to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed.'" *Id.* (citing *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1283 (Fla. 2000); *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000) (holding that an "appropriate response" to a CRN must be "based upon the insurer's good-faith evaluation of what is owed on the insurance contract")). The Court then discussed the medical records that had previously been provided to the insurer and denied summary judgment, holding:

> Indeed, based on Geico's limited investigation and the testimony of its claims examiner that her intent in offering $2,500.00 in the Second Offer was to "get some kind of conversation going," (*see* Doc. 124–2, pp. 30–32), a jury could conclude

that Geico's response to the Second CRN was not a "good-faith evaluation" of what it owed Plaintiff on the Policy. *See Vest*, 753 So.2d at 1275.

*Id.* at *8. Like in *Bachelor* the "cure" is not making an offer – it is paying what is contractually owed.[5]

Travelers did not cure its conduct because it did not pay Ms. Wopshall what was contractually owed to her: the $100,000 UM Policy limits. Travelers' attorneys manufactured an after-the-fact argument that Travelers cured its violations by making Ms. Wopshall a $5,000 settlement offer. The new (legally and factually unsupported) defense appears nowhere in Travelers' response to the CRN. And the record evidence demonstrates that what was "contractually owed" during the CRN cure period was $100,000, not a repeat of the insufficient offer previously made. Ms. Wopshall's attorneys conveyed to Travelers through both telephone communications, as well as their provision of updated medical records that Ms. Wopshall's claim warranted a tender of the policy limits. Bilotta Dep. [D.E. 56] at 35:6-36:14; 48:10-21; 118:5-18; 94:4-13; Friedman Dep. [D.E. 51] at 30:6-15. As discussed *supra* and confirmed by Ms. Wopshall's expert, Ms. Kaufman, Ms. Wopshall's claim was worth the $100,000 UM limits based on the records contained in the June 12, 2017 demand, and that the claim only increased in value based on the October 19, 2017 records provided prior to the filing of the CRN. It is intellectually discordant, and devoid of legal or factual support, for Travelers to now argue (after all other efforts to attack the CRN failed) that offering $5,000 during the 60-day safe harbor period on a claim it acknowledges is worth $2 Million "cured" its statutory violations.

WHEREFORE, Wendy Wopshall, respectfully requests that this Court deny The Travelers Home and Marine Insurance Company's Motion for Final Summary Judgment [D.E. 48], and any further relief this Court deems equitable, just, and proper.

---

[5] A CRN does not need to specify a cure. *See Hunt v. State Farm Florida Ins. Co.*, 112 So. 3d 547 (Fla. 2d. DCA 2013) ("the insurer must make a 'good faith evaluation of what is owed . . . based upon the proof of loss required by the policy and [the insurer's] expertise in advance of a determination by a court or arbitration") (quoting *Vest*, 753 So. 2d at 1275-6); *Porcelli v. Onebeacon Ins. Co.*, 635 F. Supp. 2d 1312, 1318 (M.D. Fla. 2008), *King*, 2012 WL 4052271; *Bull Bldg. Condo Ass'n v. Travelers Prop. Cas. Co. of Am.*, No. 8:08-cv-50-T-30MAP, 2009 WL 2423436 at *10 (M.D. Fla. Aug. 4, 2009); *Tropical Paradise Resorts*, No. 08-60254-CIV., 2008 WL 3889577 at *3 (S. D. Fla. Aug. 30, 2008).

Case No.: 2:21-cv-14390-DMM

Respectfully Submitted,

VER PLOEG & MARINO, P.A.
100 S.E. Second Street, Suite 3300
Miami, FL 33131
305-577-3996
305-577-3558 *facsimile*

/s/ Stephen A. Marino, Jr.
**Stephen A. Marino, Jr., Esq.**
Florida Bar No. 79170
smarino@vpm-legal.com
smcgee@vpm-legal.com
**Michal Meiler, Esq.**
Florida Bar No. 86522
mmeiler@vpm-legal.com
*Counsel for Wendy Wopshall*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on

June 15, 2022, on all counsel or parties of record on the Service List below.

/s/ Stephen A. Marino, Jr.
**Stephen A. Marino, Jr., Esq.**

## SERVICE LIST

Stephen A. Marino, Jr., Esq.
Michal Meiler, Esq.
Ver Ploeg & Marino, P.A.
100 S.E. Second Street, Suite 3300
Miami, FL 33131
305-577-3996
305-577-3558 *facsimile*
smarino@vpm-legal.com
mmeiler@vpm-legal.com
smcgee@vpm-legal.com
*Counsel for Wendy Wopshall*

Matthew J. Lavisky, Esq.
Butler Weihmuller Katz Craig, LLP
400 N. Ashley Drive, Suite 2300
Tampa, FL 33602
813-281-1900
813-281-0900 *facsimile*
mlavisky@butler.legal
*Counsel for The Travelers Home and Marine Ins. Co.*